# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 21, 2024          Decided June 20, 2025

No. 23-7142

JUNIUS JAY JOYNER, III,
APPELLANT

v.

MORRISON AND FOERSTER LLP, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-01440)

---

*Junius J. Joyner*, *III*, pro se, argued the cause and filed the briefs for appellant.

*David Lawrence Schenberg* argued the cause and filed the brief for appellees.

Before: WALKER and GARCIA, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

2

GARCIA, *Circuit Judge*:  Junius Joyner, III, was hired by a legal staffing agency and assigned to work at the D.C. office of Morrison & Foerster LLP.  Following his termination, Joyner sued that staffing agency, the law firm, and several individual employees.  He asserted claims of racial discrimination and a hostile work environment in violation of 42 U.S.C. § 1981 and Title VII, and wrongful discharge under D.C. law.  The district court dismissed Joyner's complaint for failure to state a claim. We hold that the district court properly dismissed Joyner's federal claims, but that it lacked supplemental jurisdiction over the D.C. law claims.

**I**

The following facts are alleged in Joyner's complaint and are accepted as true in our review of a motion to dismiss.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Joyner is an "African-American male."  Third Am. Compl. ¶ 1.  He was hired by the legal staffing firm Mestel & Company (hereinafter Hire Counsel) to provide temporary support on a corporate antitrust matter for Morrison & Foerster LLP.  Joyner worked on the merger of Sprint Corporation with T-Mobile U.S., Inc. at the firm's Washington, D.C. office from July to December of 2019.

Joyner's complaint describes several incidents that form the basis of his discrimination claims.

First, upon his arrival at Morrison, Joyner was assigned to work on "integration calls not previously assigned to specific integration team members."  *Id.* ¶ 22.  He was not assigned to "a particular workstream" until over two months later, which "reduced the number of hours" he could work and his compensation.  *Id.* ¶¶ 22–23.  Joyner alleges that this treatment differed from that of his "Caucasian" colleagues.  For example, during his time at Morrison, two Caucasian attorneys added to

the same merger project were assigned workstreams without any delay. *Id.* ¶ 22 n.2.

Second, during training on his first day at the firm, Joyner mentioned that he was a prepaid wireless customer. Morrison associate Evan Harris nonetheless described prepaid wireless customers as "low class" or "lower class" than postpaid wireless customers. *Id.* ¶ 19. Harris did so knowing—based on "statistical data . . . shown in the training documents"—that, like Joyner, "a large percentage of prepaid customers were African-American." *Id.*

Third, Joyner details various demeaning statements from Caucasian coworkers directed at him throughout his employment at Morrison. A colleague referred to him as "'Boy' on one occasion"; another commented that it was "stupid" for several students to post pictures of themselves posing with rifles in front of Emmett Till's memorial because they should have preserved their "anonymity"; and a group of coworkers discussed their participation in Civil War reenactments "as members of the Confederacy." *Id.* ¶¶ 25–26.

Fourth, a Caucasian coworker subjected Joyner to "constant harassment," including "physical intimidation" and "verbal and mental abuse" in the workplace. *Id.* ¶ 32 & n.5. She also lodged "unsubstantiated" claims against Joyner with the Domestic Violence Unit of the Superior Court of the District of Columbia. *Id.* ¶ 32 & n.6.

Joyner also alleges that his race motivated both Hire Counsel's denial of a request to work remotely, and Morrison's failure to inform him in advance that he was being terminated, leading to an unexpected confrontation with security and expulsion from the office building.

Separately, as the basis for his claim under D.C. law for wrongful termination, Joyner alleges that he was terminated

after reporting potential antitrust violations to firm leadership. Joyner believed that a document containing "competitively sensitive information . . . had been improperly disclosed." *Id.* ¶ 40. When he brought his concerns to the attention of Harris and others, he was fired within a week. *Id.*

Following his termination, Joyner filed a charge of discrimination with the Equal Employment Opportunity Commission, which issued him a right-to-sue letter. *Id.* ¶ 11. He filed his initial complaint in federal district court on May 29, 2020, and he has since amended it three times. This appeal concerns his third amended complaint. He claimed that Hire Counsel, Morrison, and several employees had violated Section 1981 and Title VII, and that his termination violated D.C. law. The defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, dismissing Joyner's claims with prejudice and entering judgment in favor of the defendants. *Joyner v. Morrison & Foerster LLP*, 2023 WL 6313194, at *13 (D.D.C. Sept. 27, 2023). Joyner appeals.

**II**

We review the district court's dismissal for failure to state a claim *de novo*. *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1240 (D.C. Cir. 2018). We "accept the operative complaint's well-pleaded factual allegations as true and draw all reasonable inferences" in Joyner's favor. *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020). We may also consider "any documents either attached to or incorporated in the complaint," which here includes emails between Hire Counsel and Morrison discussing Joyner, as well as portions of a transcript from the D.C. Superior Court proceeding

referenced in his complaint. *Id.* (quoting *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017)).[1]

**A**

We begin with Joyner's discrimination claim against Morrison under 42 U.S.C. § 1981, which protects "the equal right . . . to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Joyner was employed by Hire Counsel. He does not specify whether he maintained an independent contract with Morrison, but Morrison does not contest that Section 1981 applies to his allegations and so we assume that it does.

To prevail on his claim, Joyner must "initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Joyner's claim centers on the allegation that he was not assigned to a "workstream" for over two months after starting at the firm, and instead was assigned "to work on integration calls not previously assigned to specific integration team members." Third Am. Compl. ¶ 22. He does not allege facts directly suggesting his work assignment was racially motivated. Instead, he asks us to infer racial discrimination from allegations that, in his view, indicate that he "was treated differently from similarly situated employees" outside his protected class. *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014) (quoting *George v. Leavitt*, 407 F.3d 405, 412 (D.C.

---

[1] This court has held that "the liberal pleading standard for pro se litigants does not invariably apply when," as here, "the litigant is a licensed attorney." *Spence v. U.S. Dep't of Veterans Affs.*, 109 F.4th 531, 538 (D.C. Cir. 2024). Joyner filed this suit pro se but makes no request for a more liberal pleading standard, so we do not apply one.

Cir. 2005)). His theory is that other attorneys who were similarly situated to him apart from their race were "immediately assigned to workstreams," whereas he was not. Third Am. Compl. ¶ 22 n.2. And he argues that it is plausible to infer that race was the reason for that disparate treatment.

We first address the proper standard for assessing a complaint based on this type of comparator theory. The district court reasoned that to survive a motion to dismiss in a discrimination case on such a theory, a plaintiff must "demonstrate that all of the relevant aspects of [his] employment situation were nearly identical to those of the comparator[s]." *Joyner*, 2023 WL 6313194, at *5 (quoting *Redmon v. YMCA of Metro. Wash.*, 417 F. Supp. 3d 99, 103 (D.D.C. 2019), in turn quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999)).

That articulation overstates a plaintiff's burden at the pleading stage. The "nearly identical" standard is the one our cases prescribe for summary judgment or at trial, once plaintiffs have had the benefit of discovery. *See, e.g., Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015); *Holbrook*, 196 F.3d at 261 (using a similar standard for the grant of judgment as a matter of law during trial). In our cases addressing motions to dismiss, however, we have emphasized that the plaintiff's "burden at the summary judgment stage and at trial is different and substantially more onerous than the pleading burden." *Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017). After all, the pleading burden is calibrated to require only enough factual allegations "to raise a reasonable expectation that discovery will reveal evidence of" the necessary elements of a claim. *Twombly*, 550 U.S. at 556.

At the pleading stage, the standard set out by the Supreme Court in *Twombly* and *Iqbal* is the lodestar: The complaint

"must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This standard does not amount to a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (first excerpt quoting *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" and "devoid of further factual enhancement," "do not suffice." *Id.* (cleaned up).

So, in this context, a plaintiff must plead facts sufficient to allow a plausible inference that the challenged action was taken because of his race. *Brown*, 774 F.3d at 1023. And, by extension, a plaintiff proceeding on only a comparator theory must plead enough facts about those comparators and the relevant context to allow a plausible inference that he was treated differently because of his race. That standard cannot be reduced to a mechanical formula; it is sensitive to the specific context of each case, and courts must draw on their "judicial experience and common sense" in determining whether it is met. *Iqbal*, 556 U.S. at 679.[2]

---

[2] At least one circuit has held that a plaintiff need allege no more than "I was turned down for a job because of my race" to state a claim of racial discrimination. *Thomas v. JBS Green Bay, Inc.*, 120 F.4th 1335, 1337 (7th Cir. 2024) (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)). That approach echoes the pre-*Twombly* standard that the Supreme Court abrogated. *See Ho v. Garland*, 106 F.4th 47, 51 n.2 (D.C. Cir. 2024) (explaining that *Twombly* abrogated similar pre-2007 cases from this circuit concerning retaliation claims). The Seventh Circuit thought the Supreme Court's decision in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), supported its approach. *See Thomas*, 120 F.4th at 1337–38. We disagree. As *Twombly* explained, the Court in *Swierkiewicz* "reversed on the ground that the Court of Appeals had impermissibly applied what

8

But we can at least mark certain outer bounds. At one extreme, it cannot be enough to simply allege that the plaintiff was treated differently from a "similarly situated" comparator, without additional allegations showing the comparators are in fact "similarly situated" in some meaningful respect. That would be a "[t]hreadbare recital" of a "legal conclusion," "devoid of further factual enhancement." *Id.* at 678 (cleaned up). At the other pole, as noted, we have never required a complaint to include factual allegations showing that the comparator's circumstances are "nearly identical" to the plaintiff's in "all relevant aspects." *Joyner*, 2023 WL 6313194, at *5 (quotation omitted).

---

amounted to a heightened pleading requirement by insisting that Swierkiewicz allege 'specific facts' beyond those necessary to state his claim and the grounds showing entitlement to relief." *Twombly*, 550 U.S. at 570 (quoting *Swierkiewicz*, 534 U.S. at 508). The *Twombly* Court harmonized its decision with *Swierkiewicz* by clarifying that it did "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* Put otherwise, *Swierkiewicz* prohibits imposing heightened pleading requirements on plaintiffs in discrimination cases; nothing in that decision supports imposing a standard *lower* than the now-prevailing pleading standard. This court has already explained that the *Twombly* standard requires more than a bare assertion of discrimination in this context, *see, e.g.*, *Brown*, 774 F.3d at 1023; *L. Xia v. Tillerson*, 865 F.3d 643, 659–60 (D.C. Cir. 2017), and many circuits have held similarly. *See, e.g.*, *Rodriquez-Reyes v. Molina-Rodriquez*, 711 F.3d 49, 54 (1st Cir. 2013); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83–84 (2d Cir. 2015); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585–86 (4th Cir. 2015); *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019); *see also Swanson v. Citibank, N.A.*, 614 F.3d 400, 411 (7th Cir. 2010) (Posner, J., dissenting).

Our case-by-case application of the plausibility standard in this context offers further guidance. Each complaint we have found sufficient to proceed on a comparator theory has contained allegations that a comparator was similarly positioned to the plaintiff in at least some relevant respects, and included enough detail that we could plausibly infer that discrimination caused the defendant's differential treatment of the plaintiff. The traits a petitioner must plead about comparators to provide a benchmark against which the court can make such a determination will vary widely from case to case. But the question is always whether there are enough facts pleaded to make it "plausible," as opposed to just "speculative," to infer that a defendant was motivated by the plaintiff's race rather than the myriad other reasons that might affect an employment decision. *Brown*, 774 F.3d at 1023 (quoting *Twombly*, 550 U.S. at 555).

For example, in *Brown*, a law professor sued her employer for discrimination after she was denied tenure for failing to publish three articles (as the school generally required). *Id.* at 1019. She identified a comparator who was granted tenure by the same decisionmakers despite having published no articles. *Id.* at 1019, 1023. And she "sufficiently" "explained why she ha[d] equivalent qualifications" to that professor "with regard to teaching and service." *Id.* at 1023. We found those allegations sufficient to proceed to discovery. *Id.*

We reached a similar result in *Nanko Shipping*, where a shipping company alleged that Alcoa, Inc. refused to do business with it because of its owner's race. The complaint alleged that Nanko had the specific necessary qualifications to perform the work the comparators were performing (and even partnered with the same third-party shipping companies), and that it had offered to perform the work at lower cost, but was repeatedly ignored or subjected to harsher treatment than those other companies. 850 F.3d at 467 (citing Second Am. Compl.

¶¶ 3, 17, 57–68, *Nanko Shipping, USA v. Alcoa, Inc.*, 107 F. Supp. 3d 174 (D.D.C. 2015), Dkt. No. 14-1). Those allegations, we held, plausibly suggested that Alcoa "treated [it] less favorably than similarly situated white-owned companies." *Id.*

And in *Wright v. Eugene & Agnes E. Meyer Foundation*, 68 F.4th 612 (D.C. Cir. 2023), the plaintiff alleged that although her former employer defamed her after her termination, that same employer "did not defame her predecessor, a white man who also separated from the company, nor any other non-African-American employee." *Id.* at 622. The allegations that the comparator served in the exact same role and had also been terminated sufficed to plausibly show the two individuals were similarly situated in the context of that case. *See id.* We also explained that allegations that Wright's performance had recently been praised, and that there was a "general culture of racial inequity at the Foundation," pushed her claim "farther over the plausibility threshold." *Id.* at 623.

By contrast, we upheld the dismissal of a Section 1981 claim in *L. Xia v. Tillerson*, 865 F.3d 643 (D.C. Cir. 2017). There, Chinese nationals alleged that their naturalization certificates had been summarily canceled without appropriate process. *Id.* at 646. The plaintiffs' only attempt to show that similarly situated individuals had been treated differently was to provide "a chart that purport[ed] to list denaturalized former U.S. citizens" and then to "assert without factual support that the list contain[ed] over a hundred 'similarly situated persons of other' (*i.e.*, non-Chinese) 'original ethnicity' who were denaturalized via valid processes not equally offered to the plaintiffs." *Id.* at 660. We explained that the plaintiffs did not "identify the listed individuals' ethnicities or the process they received before being denaturalized," meaning "the court"

could not "infer more than the mere possibility of misconduct." *Id.* (quotation omitted).

Although the described pleading standard is "not onerous," *Nanko Shipping*, 850 F.3d at 467 (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)), Joyner fails to meet it. Again, Joyner's Section 1981 claim against Morrison focuses on the fact that he was not assigned to a "particular workstream" for over two months after beginning work at the firm. Third Am. Compl. ¶ 22. His sole allegations about comparators come in a footnote, where he first alleges that three Caucasian attorneys who began at Morrison either before or after him were immediately assigned to workstreams. *Id.* ¶ 22 n.2. He then alleges "on information and belief" that "all attorneys that were [not African American and were] hired through Hire Counsel were immediately assigned to workstreams." *Id.* In context, those allegations are insufficient.

To start, the complaint includes no information about the other attorneys' experience or qualifications relative to Joyner's. As to the three specific attorneys Joyner identifies, he does not even allege that they were placed through Hire Counsel as opposed to being hired directly or through a different staffing firm. Nor does he allege that the Hire Counsel attorneys worked on his project, or a similar project. *See id.* Unlike in *Wright*, then, the factual allegations do not show that Joyner and his comparators worked in the same position in a meaningful sense. *See* 68 F.4th at 622. Instead, Joyner has alleged only that he and his comparators were attorneys working at the same law firm.

Moreover, even if such allegations might suffice in another case, they do not here given two additional features of the complaint.

12

The first is that it is entirely unclear what a "workstream" is, how many there were, or what would make someone qualified for a workstream assignment. The complaint does not describe the term, even in a general way, except to note that such an assignment could allow an attorney to work more hours than the similarly unclear role Joyner was initially assigned (fielding "integration calls not previously assigned to specific integration team members"). Third Am. Compl. ¶ 22. Still further, the complaint suggests there existed several distinct workstreams on his project, each with different needs and roles. Because the "workstream" assignment Joyner sought could, based on his pleadings, have encompassed any number of different roles and responsibilities, each requiring different experience and qualifications, it is necessarily more difficult to infer that Joyner and other attorneys were similarly situated with respect to such an assignment. This is a marked contrast with cases like *Brown* and *Nanko*, where the plaintiff was denied a discrete opportunity (tenure, or specific contract awards) that the defendant decided to grant to some but not others in a way that facilitated comparative inferences.[3]

Second, Joyner's complaint does not allege that the same supervisor or supervisors were responsible for deciding whether to place him and the other attorneys on a workstream. Our cases have repeatedly recognized that whether the same decisionmakers were involved is relevant to whether two employees were similarly situated. *See, e.g.*, *Burley*, 801 F.3d at 301; *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109,

---

[3] In this vein, it is notable that although Joyner alleges that the two attorneys who arrived at Morrison after him were "immediately" placed on workstreams, Joyner does not clarify whether that occurred before or after he was placed on a workstream himself. Third Am. Compl. ¶ 22 n.2.

1116 (D.C. Cir. 2016). And there was no uncertainty on this score in *Brown*, *Nanko*, or *Wright*.

Each of these variables makes it less plausible that Joyner was similarly situated to other attorneys who received workstream assignments in the ways that mattered to the unspecified manager(s) making those decisions.

We do not mean to suggest that Joyner was required to plead *all* of these facts in his complaint to survive a motion to dismiss. That type of showing would be more akin to what is required at summary judgment or trial. *See supra* at 6. Nor did we insist upon that level of detail in *Brown*, *Nanko*, or *Wright*. The problem for Joyner is that he pleaded essentially no facts at all to show that his identified comparators were similarly situated to him in relevant respects except that they were attorneys working at the same law firm. Paired with the nebulous and varied nature of a "workstream" assignment, and the lack of allegations showing that the same decisionmakers made assignments to the many positions on "workstreams," Joyner's general allegations about comparators do not provide a meaningful benchmark against which to assess whether Morrison's treatment of him was racially motivated. His allegations do "not permit the court to infer more than the mere possibility of misconduct." *L. Xia*, 865 F.3d at 660 (quoting *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009)).

**B**

Joyner also sued Hire Counsel for discrimination based on race under Section 1981. Third Am. Compl. ¶¶ 130–33. Hire Counsel denied Joyner's request to work remotely for three days, even though it "had authorized similar or longer remote work for Caucasian" employees. *Id.* ¶¶ 57–58. Joyner does not offer any other allegations about these comparators or the circumstances of their remote work requests. He does point to

one specific Caucasian attorney who received permission to work remotely for two weeks. *Id.* ¶ 57, Ex. 4. But he does not allege that this coworker was employed by Hire Counsel or that Hire Counsel otherwise was responsible for any remote work arrangement. Under the framework described above, these allegations do not suffice to plausibly plead that Hire Counsel denied the request because of Joyner's race.

Further, Joyner's own pleadings raise—and then offer nothing to rebut—at least one alternative explanation for Hire Counsel's denial of his request. Joyner attached to his complaint an email suggesting the request was denied because he had directed it to Morrison rather than to Hire Counsel, in violation of Hire Counsel's protocol. *Id.* Ex. 5. The email clarified that it was a "final warning," after which continued requests on employment matters to Morrison rather than Hire Counsel would result in "disciplinary action." *Id.* That "obvious alternative explanation[]" further confirms that discrimination is not a plausible inference. *Ho v. Garland*, 106 F.4th 47, 54 (D.C. Cir. 2024) (quoting *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 373 (8th Cir. 2017)).[4]

### III

Joyner also lodges hostile work environment claims against the corporate defendants under Section 1981 and Title VII, 42 U.S.C. § 2000e-2(a)(1). We "use the same framework for determining whether unlawful discrimination has occurred" under both statutes. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam). To make out a hostile work environment claim, a plaintiff must plausibly plead that "he

---

[4] Joyner pleads similar claims against the individual defendants, Harris, Natalie A. Fleming Nolen, and Patti Ayala. Third Am. Compl. ¶¶ 152–73. But he raises no independent argument as to those claims on appeal, so we do not address them. *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

was exposed to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *Durant v. D.C. Gov't*, 875 F.3d 685, 700 (D.C. Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). The allegations must also be "adequately linked such that they form a coherent hostile environment claim." *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015) (cleaned up). "For example, they might involve the same type of employment actions, occur relatively frequently, and be perpetrated by the same managers." *Id.* at 169. To assess such claims, a court should consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

## A

Joyner's allegations against Morrison do not state a hostile work environment claim under those standards. Several of Joyner's allegations describe statements by other attorneys working in the same conference room. These include "disparaging comments about Emmett Till," "being called 'Boy,'" and his allegations about coworkers' participation in Civil War reenactments. Third Am. Compl. ¶ 74; *see also id.* ¶ 26.

But Morrison is liable for the actions of Joyner's coworkers—as opposed to his supervisors—only if it "was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). That theory requires allegations that Morrison "knew or should have known of the harassment and failed to implement prompt and appropriate corrective action." *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). Here, Joyner does not plausibly

allege that his supervisors were aware of these incidents. He does not allege that he notified any supervisor of his coworkers' comments. Joyner's only relevant allegations are that a secretary questioned how Joyner could stand working in that conference room, and that Harris stated at one point, "We don't want you down there!" Third Am. Compl. ¶¶ 28–29. Those allegations, without more, do not plausibly support an inference that Morrison knew of his coworkers' actions and failed to respond, even if we assume (without deciding) that Harris qualified as a supervisor.

Joyner does allege that he brought his concerns about abuse and false claims from one coworker to Morrison's attention. *Id.* ¶¶ 32–33. But Joyner alleges that Morrison quickly responded to those concerns by separating the employees in the workspace. *Id.* ¶¶ 32–34. Once Joyner was cleared of misconduct, he was returned to his prior workspace. *Id.* Per the complaint itself, then, Morrison took "prompt and appropriate corrective action," and so was not negligent in addressing the underlying conduct. *Curry*, 195 F.3d at 660.

The remaining incidents Joyner alleges, even if attributable to Morrison, do not approach the level of "severe" and "pervasive" harassment we have required to state a hostile work environment claim. *George*, 407 F.3d at 416 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998)). These include, for example, Harris's alleged statement that prepaid wireless customers were "low class" compared to postpaid wireless customers, Third Am. Compl. ¶ 19, and Morrison's failure to immediately assign him to a workstream, which is not plausibly race-based for the reasons given above. Joyner also alleges that his firing subjected him to further humiliation "because of his race," *id.* ¶ 83, but that allegation assumes the legal conclusion his pleadings are required to support. In sum, these claims do not constitute a "coherent hostile [work] environment claim" against Morrison.

*Baird*, 792 F.3d at 168 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)).

**B**

Joyner also brings a hostile work environment claim against Hire Counsel, but his allegations fail for similar reasons. Joyner alleges that he reported his concerns about his coworkers to Hire Counsel, but he does not allege that Hire Counsel employed these coworkers, or that it could take any action against them. Third Am. Compl. ¶ 52. Joyner points also to "threatening emails" denying his request to work remotely and Hire Counsel's failure to inform Joyner that he was discharged. *Id.* ¶ 127. One of those emails makes clear that the decision not to permit his remote work request was due to his attempt to circumvent the requirement that he obtain Hire Counsel's approval. It does not evidence discrimination or insult. Neither does the method of his termination. *Id.* ¶ 62. Like Joyner's allegations against Morrison, those against Hire Counsel do not rise to the level of "an objectively hostile or abusive work environment." *Harris*, 510 U.S. at 21.[5]

**IV**

The district court dismissed Joyner's wrongful-discharge claim under D.C. law against Morrison and Hire Counsel for failure to state a claim. Upon review, we identify a threshold obstacle for this claim: The district court lacked jurisdiction to consider it, and so do we. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998).

The district court properly had subject matter jurisdiction over Joyner's federal claims per 28 U.S.C. § 1331 because they

---

[5] As with his Section 1981 claims, Joyner does not challenge the district court's dismissal of the hostile work environment claims against the individual defendants. Third Am. Compl. ¶¶ 175–189.

arise under federal laws. Because Joyner has not alleged diversity of citizenship between himself and the defendants, the only potential basis for federal jurisdiction over his state-law claim is 28 U.S.C. § 1367(a), which provides for supplemental jurisdiction over claims that are "so related . . . that they form part of the same case or controversy" as claims over which a federal court has original jurisdiction. To make that determination, we ask "whether the state and the federal claims 'derive from a common nucleus of operative fact.'" *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 920 (D.C. Cir. 1996) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)). The clearest case for supplemental jurisdiction is where "the same acts violate parallel federal and state laws"—say, if Joyner had raised a claim under D.C. laws prohibiting discrimination based on the same or similar facts underlying his federal discrimination claims. *Lindsay v. Gov't Emps. Ins. Co.*, 448 F.3d 416, 424 (D.C. Cir. 2006) (quoting *Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir. 1995)). In such a case, the "operative facts" overlap.

There is no meaningful overlap between the operative facts of the federal and state claims here. The federal claims involve Joyner's allegations of racial discrimination and a hostile work environment while working at Morrison. His state law claim, by contrast, is that he was wrongfully discharged for reporting to Morrison what he believed to be improper disclosure of competitively sensitive information. Third Am. Compl. ¶¶ 40–54. That claim requires him to (1) pinpoint "some identifiable policy that has been officially declared in a statute or municipal regulation, or in the Constitution," (2) show that there is a "close fit between" that policy and the matters he reported, and (3) show that his "protected activity was the predominant cause of [his] termination." *Davis v. Cmty. Alts. of Wash., D.C., Inc.*, 74 A.3d 707, 709–10 (D.C. 2013) (cleaned up). If Joyner succeeded in proving that he was

terminated for reporting antitrust violations in a way that made out his wrongful termination claim under D.C. law, that would do nothing to inform the analysis of his federal race discrimination or hostile work environment claims, and vice versa. The only facts in common between the federal claims and the D.C. law claim are the background facts that Joyner was employed by Hire Counsel and placed at Morrison; those are not "operative" facts in the sense the case law requires.

Although our court has not directly confronted an analogous fact pattern, the weight of authority in other circuits and in this circuit's district court suggests that such a minimal connection between claims is insufficient to support supplemental jurisdiction. As the Third Circuit has put it, supplemental jurisdiction is unavailable "under any standard" when "[t]he only link between [a plaintiff's federal] and state law claims is the general employer-employee relationship between the parties." *Lyon*, 45 F.3d at 762; *see also Shavitz v. Guilford Cnty. Bd. of Educ.*, 100 F. App'x 146, 150–51 (4th Cir. 2004) (per curiam) (though claims all arose from government's red-light camera program, such "superficial factual overlap" is insufficient where the "operative facts" do not overlap); *Wisey's # 1 LLC v. Nimellis Pizzeria LLC*, 952 F. Supp. 2d 184, 191 (D.D.C. 2013) (no supplemental jurisdiction where state claims "do not have a legal overlap with the [federal] claims" and the only factual overlap is that the claims "relate[d] generally to the parties' broader background dispute"); *Clark v. District of Columbia*, 2024 WL 3181440, at *16 (D.D.C. June 26, 2024) (no supplemental jurisdiction where, despite "some background factual overlap" in that all claims related to plaintiffs' employment with the defendant, "as currently pled, the facts that could, if proven, give rise to liability on Plaintiffs' collective Section 1981 claim[s] are separate from the facts that could, if proven, give rise to liability on" the state law claims); 13D *Wright & Miller's Federal Practice & Procedure* § 3567.1 (3d ed.)

20

("[T]he fact that claims arise from an employment relationship will not necessarily mean that they are sufficiently related to support supplemental jurisdiction."). We find these authorities persuasive and are aware of no contrary authority on similar facts.[6]

We therefore vacate the district court's judgment on that claim and remand with instructions to dismiss for lack of jurisdiction.

## V

Finally, Joyner challenges the district court's decision to dismiss his third amended complaint with prejudice. We review that choice for abuse of discretion. *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004). As the district court explained, Joyner "has already amended his complaint three times, and the deficiencies in those claims in the Third Amended complaint were previously identified in [Morrison's] Motion to Dismiss [his] Second Amended Complaint." *Joyner*, 2023 WL 6313194, at *13 n.11. In these circumstances, we cannot conclude that the district court abused its discretion by declining to offer Joyner yet another opportunity to plead his claims.

---

[6] The Third Circuit in *Lyon*, 45 F.3d at 762, thought this court's decision in *Prakash v. American University*, 727 F.2d 1174 (D.C. Cir. 1984), could be read as contrary authority. *Prakash* held that where a plaintiff brought a Fair Labor Standards Act claim, supplemental jurisdiction was proper over his D.C. law claims for breach of contract and various torts. There, however, the Court understood all the plaintiff's claims to stem from his "contract dispute with the University," which concerned whether the University had made and breached a contract to employ the plaintiff permanently and on what terms. *Id.* at 1183. As described in the text, Joyner's claims do not share a similar commonality.

21

## VI

For the forgoing reasons, we affirm the district court's dismissal of Joyner's employment discrimination and hostile work environment claims. The district court's decision on Joyner's claim under D.C. law is vacated and remanded with instructions to dismiss for lack of jurisdiction.

*So ordered.*